UNITED STATES DISTRICT COURT                          <u>For Online Publication Only</u>
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
JOHN MANGINO,

                                    Plaintiff,                      **<u>ORDER</u>**
                                                                    12-CV-5434 (JMA) (ARL)

                     -against-
                                                                    **FILED**
                                                                    **CLERK**
TOWN OF BABYLON, and ANN MARIE JONES,                               4:25 pm, Feb 26, 2024

                                    Defendants.                     **U.S. DISTRICT COURT**
-------------------------------------------------------------------X                        **EASTERN DISTRICT OF NEW YORK**
                                                                    **LONG ISLAND OFFICE**

**AZRACK, United States District Judge:**

Defendants Ann Marie Jones and the Town of Babylon ("Town") have filed post-trial

motions for judgment as a matter of law under Federal Rule of Civil Procedure 50 and for a new

trial under Federal Rule of Civil Procedure 59.  For the reasons stated below, the Court denies

Defendants' motion for judgment as a matter of law but grants Defendants' motion for a new trial.

## I.  BACKGROUND

### A.  <u>Overview and Procedural History</u>

Plaintiff John Mangino ("Mangino") is a landlord who owns four rental properties in the

Town.  Mangino was issued criminal summonses for failing to obtain rental permits for the

properties and was also sued civilly by the Town.

Mangino claims that Defendants violated the First Amendment by retaliating against him

after he engaged in various protected speech.  His protected speech included letters he sent to the

Town in which he complained about, among other things: (1) the Town's method of serving

criminal summonses; and (2) the Town's refusal to grant him a rental permit.  The criminal

proceedings brought by the Town against Mangino were all ultimately dismissed.

Before trial, the Court bifurcated the trial into liability and damages phases.

The liability phase of the trial lasted three days.  During Plaintiff's case, Plaintiff testified along with: (1) Edward Raskin, an attorney who represented Plaintiff and defended him in the criminal prosecutions; (2) Afreen Wright, an Assistant Town Attorney; and (3) Joseph Wilson, who was the Town's Special Prosecutor.  (See Tr. 29, 291–92.)[1]  Wilson was hired in 2006 as an Assistant Town Attorney.  (Tr. 29.)  At some point between 2008 and 2009, Wilson became the Special Prosecutor and was in that position during all the relevant events at issue.  (Tr. 29.)  He eventually became the Town Attorney in January 2012.[2]  (Tr. 30.)  As a special prosecutor, Wilson oversaw one attorney and would "make decisions on individual cases" and "try" the cases.  (Tr. 81.)  His main function as Special Prosecutor was to prosecute violations of the Town of Babylon Code ("Town Code").  (Tr. 81.)

The defense called Jones, who was the Commissioner of the Town's Planning and Development Department ("Planning Department") from 2007 to 2014.  (Tr. 317.)  The Planning Department employed around thirty employees and consisted of nine divisions and three boards.  (Tr. 318, 325.)  The Planning Department's Rental Division is responsible for issuing rental permits.  (Tr. 318–19.)  Inspectors employed by the Planning Department's Code Enforcement Division inspect properties for code violations and issue criminal summonses for such violations.  (Tr. 318–19.)  The Town Attorney's Office prosecutes those criminal summonses and can also bring civil suits for violations of the Town Code.

In the liability phase of the trial, Plaintiff prevailed on some of his retaliation claims against both Jones and the Town.  The jury found that the denial of Mangino's rental permit application

---

[1]  Hereinafter, the trial transcript, (ECF Nos. 110-5, 114-2), is cited as "Tr."  The parties' trial exhibits, where were submitted piecemeal on the docket in various filings, are cited as "Pl. Tr. Ex." And "Def. Tr. Ex."

[2]  At trial, Wilson explained that, as Town Attorney, his functions were "enumerated in the town code," and he oversaw a staff of five other attorneys as well as paralegals and other support staff.  (Tr. 81-82.)  As Town Attorney, he would also provide legal advice for all the departments within the Town.  (Tr. 82.)

in April 2009 and the initiation of four civil suits against him in October 2009 were both motivated by his protected speech.  The jury found both Jones and the Town liable on these claims and rejected, on the verdict sheet, the defense that the same decisions would have been taken irrespective of Plaintiff's protected speech.  The jury, however, rejected Plaintiff's claims that his protected speech was a motivating factor behind the criminal summonses he was issued and a July 2009 arrest warrant the Town sought.

Just after the jury's liability verdict, the Court held a one-day damages trial.  During the damages trial, Mangino and his wife testified.  The jury ultimately awarded Mangino $76,550 in compensatory damages against Defendants, consisting of $7,300 for the denial of the permit and $69,250 for the initiation of the civil suits.  The jury also awarded $875 in punitive damages against Jones for the denial of the permit.

Currently pending before the Court are post-trial motions filed by Defendants that seek judgment as a matter of law and a new trial.  In these post-trial motions, Defendants argue, <u>inter alia</u>, that the evidence at trial was insufficient to establish that Jones—who was both an individual defendant and the relevant final decisionmaker for purposes of the <u>Monell</u> claim against the Town—was aware of Mangino's protected speech and was motivated by such speech to deny the permit.  Defendants also assert that Jones was not involved in the initiation of the civil suits and that there was no basis to hold the Town liable for those suits under <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978).

In response to the post-trial motions, Plaintiff maintains that the evidence at trial could support the jury's verdicts and that the jury made reasonable credibility determinations of the witness testimony at trial.  Plaintiff also contends that Defendants' Rule 50 motion for judgment as a matter of law should be denied because Defendants did not raise their current arguments at

trial.  At the close of Plaintiff's case at the liability trial, Defendants moved for judgment as a matter of law on certain grounds but did not raise or pursue the specific arguments that they now raise in their post-trial Rule 50 motion.  (See Tr. 301–09.)  After Jones testified for the defense, Defendants did not renew their motion for judgment as a matter of law during the liability phase of the trial.  Defendants only renewed their Rule 50 motion after the jury had returned its liability verdicts, the parties had presented additional evidence on damages, and the Court had finished instructing the jury on damages.  At that point, Defendants sought to renew their Rule 50 motion "for the same reasons as stated previously."  (Tr. 454.)  Defendants did not advance any further arguments at that time and did not address Jones's testimony in any fashion.

The factual background set out below is taken from the trial record.

### B. **Town of Babylon Rental Permit Scheme and Code Enforcement**

The Town Code requires the owner of rental housing to obtain a rental permit.  (Babylon Town Code § 153-2, Def. Tr. Ex. A, ECF No. 110-9; Tr. 84.)  To obtain a rental permit, the owner must submit an application to the Rental Division of the Planning Department.  (Babylon Town Code § 153-3; Tr. 85.)  In 2009, the rental permit fee was $100; an extra $25 fee was required for each additional rental unit at a property.  (Tr. 85; Pl. Tr. Ex. 7, ECF No. 114-11.)  After receiving the application, the applicant would be scheduled for an inspection by the clerk in the Rental Permit Division.  (Tr. 85.)  The inspection would only occur after the rental permit application was properly submitted.  (Tr. 141.)  The rental permit would not be issued until an inspection was completed and certified that there were no code violations at the property.  (Babylon Town Code § 153-6.) If the owner did not want a building inspector from the Town to come onto their property, the owner could hire a licensed engineer to conduct an inspection at the owner's expense.

4

(Babylon Town Code § 153-6(B); Tr. 91.)  Rental permits are valid for two years from the date they were issued.  (Babylon Town Code § 153-4.)

If a citizen complained about how a particular a property was being used, the complaint would be sent to the Code Enforcement Division of the Planning Department and an inspector would then inspect the property.  (Tr. 83, 319.)  If an inspector found a violation, the inspector would issue a summons "and then the town attorney's office would handle the prosecution from there on out."  (Tr. 83.)

## C.  Mangino and His Properties in the Town

Mangino owns four properties in the Town as well as other properties elsewhere on Long Island.  (Tr. 215, 232.)  Mangino purchased his property at 25 West 1st Street, Deer Park ("25 West 1st St.") in 1994 or 1995.  (Tr. 215.)  He subsequently purchased three additional properties in the Town.  (Tr. 215–16.)

When Mangino purchased 25 West 1st St., the property had a rental permit, which eventually expired on July 15, 1997.  (Pl. Tr. Ex. 1, ECF No. 114-16.)  Mangino, however, never renewed this rental permit.  (Id.; Tr. 216.)  Mangino did not obtain a rental permit because he believed that the Town's rental permit requirement was unconstitutional.  (Tr. 210–11, 217.)

If Mangino was renting this property between 1997 and 2009, the Town Code required that he apply for rental permits every two years and he would have needed to pay the necessary fees for each permit.

## D.  Mangino is Issued Summonses in 2006 and a Final Notice in February 2009

On December 19, 2006, the Town received an anonymous complaint that several residents were living at 25 West 1st St, including new tenants in the basement.  (Tr. 105–06, 142; Def. Tr. Ex. H at 3, ECF No. 118-12.)  On December 21, 2006, the property was inspected; litter and bagged

garbage were observed, and Mangino was issued a criminal summons for not having a required rental permit for this property.  (Tr. 30, Tr. 216; Def, Ex. H at 3.)  This summons—as well as the various other summonses Mangino was subsequently issued for not having a rental permit—were all served via substitute service.[3]  (Tr. 136–37, 159.)

During 2007, the hearing date for the December 2006 summons was repeatedly adjourned. (Def. Tr. Ex. H at 3.)  At some point, an arrest warrant was issued for the December 2006 summons. (Tr. 30.)

The Town also issued other summonses based on the absence of a rental permit for the 25 West 1st St. property both prior to and after the December 2006 summons.  Specifically, such summonses were issued in April 2006 and February 2008.[4]  (Def. Tr. Ex. H.)  It appears that these two summonses were both dismissed prior to 2009.

The Town eventually issued Mangino a "Final Notice" on February 19, 2009 advising him that the rental permit for 25 West 1st St. had expired on July 14, 1997 and that Mangino owed a total of $875 in fees.  (Pl. Tr. Ex. 1; Tr. 33; see also Tr. 171; Def. Tr, Ex. H.)  The fees demanded by the Town consisted of $625 in application fees and $250 in late fees (with a $50 late fee being assessed for each of the five missing permit applications).  (Pl. Tr. Ex. 1.)  Enclosed with the Final

---

[3]  Mangino asserted—both in 2009 and at trial— that New York law prohibited the Town from serving these summonses using substituted service.  At trial, Mangino also claimed that the Town's use of substitute service was retaliatory.  However, there was unrebutted testimony that the Town had served summonses using substituted service for decades.  (Tr. 94, 137.)  Given that evidence, the Court ultimately refused to submit to the jury Mangino's claim that the Town's use of this method of service constituted retaliation.

[4]  At trial, the defense introduced a computer generated "Inspection Comment Report" from its files that recounted complaints, summonses, and related events concerning Mangino's four properties.  This document indicated that Mangino was issued other summonses for 25 West 1st St. before and after December 2006, including in April 2006. In April 2006, the Town received a complaint about an illegal multiple dwelling at this location.  (Def. Tr. Ex. H at 2.)  An investigation later that month revealed that the property had no rental permit and was occupied; a tenant named Shwana Houston had left a phone message for the inspector after the inspector had left a business card at the property. The inspector issued a summons because the property did not have a rental permit.  (Def. Tr. Ex. H at 2.)

6

Notice were renewal applications for the five missing rental permit applications, which each covered a two-year period between July 1999 and July 2009.[5]  (Id.)

The February 19, 2009 Final Notice was signed by Ann Marie Jones, the Commissioner of the Planning Department.  (Pl. Tr. Ex. 1.)  Jones testified at trial that this was an electronic signature affixed to the notice by a clerical employee in the Rental Permit Division and that Jones did not personally sign this document.  (Tr. 327–27.)  Another document with Jones's signature from September 22, 2009—which ultimately granted Mangino's permit application—appears to contain the exact same signature and appears to confirm Jones's testimony that this was an electronic signature.  (Pl. Tr. Ex. Tr. 7.)  Plaintiff maintains that the jury was entitled to not credit that testimony.

**E.  The Evidence Concerning 25 West 1st St.**

Mangino testified that he first learned about the outstanding arrest warrant around February 2009 when he received the February 19, 2009 Final Notice from the Town.  (Tr. 218.)  After learning of the arrest warrant, Mangino hired Raskin to defend him and then went to court and "recalled the warrant."  (Tr. 31, 220–22.)

Around March 17, 2019, Mangino applied for a rental permit for 25 West 1st St.  (Tr. 32, 35, 53, 223; Pl. Tr. Ex. 2, ECF No. 114-7.)  Despite the Town's demand that he pay $875, Mangino's rental application included a check for only $125.  (Id.)  Mangino has contended that his submission of this $125 check constituted protected speech and was effectively a protest

---

[5] The February 19, 2009 Final Notice indicated that Mangino had paid the rental permit fee for the time period between July 1997 and July 1999 but that a rental permit had not been issued.  The Town did not request that Mangino pay any back fees for this 1997-1999 permit period.

against the Town's demand that he pay $875.[6]  (Tr. 305; see also Tr. 376.)

At some unspecified point in April 2009, Raskin filed a motion in the criminal proceeding for the December 2006 summons.[7]  (Tr. 32.)  Raskin's motion asserted, inter alia, that an improper method of service had been used for the December 2006 summons.  (Tr. 32.)

On April 23, 2009, the Town issued Mangino another criminal summons for 25 West 1st St. because the property lacked a rental permit in violation of the Town Code.  (Pl. Tr. Ex. 18, ECF No. 114-14; Pl. Tr. Ex. 6, ECF No. 118; Tr. 52.)

On April 24, 2009, Howard Freedman, an assistant Town Attorney, wrote a letter to Mangino.  (Pl. Tr. Ex. 2, ECF No. 114–7; Tr. 34.)  Freedman's letter recounts that Mangino had recently sent the Town a $125 check "as payment for a rental permit despite being told that you had arrears and penalties totaling $875.00."  (Pl. Tr. Ex. 2.)  Freedman informed Mangino that if he had simply paid the $625 in application fees, the $250 in penalties may have been waived.  (Id.)  Freedman also informed Mangino that his rental permit application and check were being returned and that he was required to pay $875 for the "Rental Permits."[8]  (Id.)

---

[6]  At trial, the Court instructed the jury that "Mangino's written objections to the town's denial of his rental permit and the town's method of serving criminal summonses constituted protected speech under the First Amendment." (Tr. 368.)  As explained infra, Mangino only began sending these written objections to the Town in April 2009.  The Court did not instruct the jury that Mangino's submission of the $125 check constituted protected speech.  After the Court finished reading the charge, Mangino asked, for the first time, that the jury also be instructed that the tender of the $125 constituted protected speech.  The Court denied this belated request to amend the jury charge.  (Tr. 376.)

[7]  While Wilson admitted at trial that this motion was filed sometime in April 2009, the trial record does not specify when, during April 2009, Raskin filed this motion.  (Tr. 32.)  As discussed infra, a letter sent by Mangino on May 28, 2009 indicates that Raskin had filed the motion at some point prior to May 28.  However, when Raskin was questioned about this motion, he testified that this motion was filed in June 2009.  (Tr. 190.)  The trial record does not provide further information about when this motion was filed and a copy of the motion was not admitted into evidence.  A copy of the judge's decision on the motion was admitted into evidence; that decision indicates the motion was filed in June 2009.  (Def. Tr. Ex. C, ECF No. 118-7, Tr. 190.)

[8]  At one point during his testimony, Mangino stated that his permit application was actually rejected before Freedman's April 24 letter.  (Tr. 223–24.)  Mangino did not identify how this denial was communicated to him.

There was evidence at trial that the Rental Permit Division had a long-standing policy that required owners who sought renewal of rental permits to pay any back fees and penalties for prior years before the permit would issue and an inspection would be scheduled.[9]  (Tr. 145 (testimony of Wilson); Tr. 320 (testimony of Jones).)

On April 28, 2009, Mangino's attorney, Edward Raskin, wrote a letter to Freedman asserting that the Town did not have the authority to charge Mangino $875 (or even $625) for a rental permit and that Mangino only had to pay $125 for a standard two-year rental permit.  (Pl. Tr. Ex. 3, ECF No. 114–8; Tr. 187.)  Raskin contended that Mangino was seeking a "new" rental permit—rather than a renewal—and that the Town Code did not require expired rental permits to be renewed.  (Pl. Tr. Ex. 3; Tr. 131–32, 194.)  Raskin's letter asserted that if the Town were to "claim that Mr. Mangino has been renting the subject premises since the expiration of the prior permit several years ago, there is no evidence to support such speculation."[10]  (Pl. Tr. Ex. 3.)  Raskin's letter included Mangino's permit application and $125 check and again requested that the Town grant the permit.  (Id.)

In a letter dated April 30, 2009, Freedman responded to Raskin.  Freedman explained that Mangino had been informed that, if the property was vacant during the relevant time period, Mangino had the option to submit a notarized affidavit attesting to that fact.  (Pl. Tr. Ex. 4, ECF

---

[9]  During Wilson's trial testimony, Wilson was confronted with his prior deposition testimony where he stated that, prior to Mangino's case in 2009, he was not aware of this policy and that this was "the first [he] heard about it." (Tr. 59–61.)  Plaintiff asserts that this testimony created a factual dispute about whether the Town had a long-standing policy to collect back fees.  The Court notes that Wilson was not asked at trial whether any of the cases he prosecuted prior to 2009 involved properties involving missing rental permits that would have been covered by this policy.

[10] The record indicates that the Town had ample reason to believe that Mangino was renting to tenants between 1997 and 2009.  First, the existence of a prior rental permit suggested that the property likely continued to be rented.  Second, as explained supra, the Town received substantiated complaints in April and December 2006 that the property was being rented.  (See Def. Tr. Ex. H at 2; Tr. 132.)  Third, as discussed infra, Mangino had the option of submitting an affidavit to the Town attesting that the property was not rented during this time period.  Mangino, however, declined to submit such an affidavit.

No. 114-9; Tr. 36; see also 181–82.)  Mangino, however, never submitted any such affidavit.  (Tr. 182.)  If such an affidavit had been submitted and department found it to be accurate, the back fees would have been waived for the years in question.  (Pl. Tr. Ex. 4; Tr. 181.)

On May 28, 2009, Mangino wrote a letter to Freedman asserting that the Town's service of the criminal summonses on him was improper.  (Pl. Tr. Ex. 5, ECF No. 114-10.)  Mangino's letter asserted that he would "hold all responsible parties accountable for any warrant issued and/or arrest that may result from warrants emanating from improperly served criminal proceedings, including but not limited to pursuit of malicious prosecution and/or constitutional violations in an appropriate State and/or Federal court."  (Id.)  According to the letter, Mangino attached a copy of a motion that Raskin had filed on Mangino's behalf in the pending criminal action.[11]  (Id.)

On July 13, 2009, the Town sought a warrant for Mangino's arrest.  (Pl. Tr. Ex. 6; Tr. 42, 193.)

As noted earlier, at some point between April and June 2009, Raskin had filed a motion in the criminal proceeding asserting that the December 2006 summons had not been properly served and that personal, rather than substitute service, was required.  On August 10, 2009, the state court judge presiding over that criminal proceeding rejected Mangino's argument and ruled that the Town's service of the summons was proper.  (Def. Tr. Ex. C; Tr. 117.)

On August 25 or 26, 2009, the Town issued criminal summonses to Mangino for all four of his properties because they lacked rental permits.[12]  (Tr. 51–52.)

---

[11]  The copy of the letter introduced at trial did not include this motion.

[12]  At trial, Mangino did not pursue retaliation claims concerning the issuance of the criminal summonses for these three other properties because those three properties lacked permits as of August 25, 2009 and unlike 25 West 1st St., Mangino had not even applied for permits for those properties when those summonses were issued.  Mangino acknowledged prior to trial that he could not pursue retaliation claims for these three criminal summonses because: (1) Defendants had probable cause to issue those summonses; and (2) probable cause for a criminal prosecution precludes a claim that the prosecution was retaliatory.

On September 14, 2009, Mangino submitted another rental application for 25 West 1st St. (Tr. 57–58, 176; Pl. Tr. Ex. 7.)  The Town ultimately issued this permit on September 22, 2009 after a building inspector from the Town inspected the property.  (Pl. Tr. Ex. 7.)  Accompanying the approved rental permit was a cover letter containing Jones's signature as Commissioner of the Planning Department.  (Id.)  The letter simply notes that the permit has been granted.  (Id.)

Although Mangino only submitted a check for $125 for this rental permit, the Town accepted and processed this application.  At some point—apparently in September 2009—Wilson reviewed Mangino's file (including Raskin's April 28 letter to Freedman and Freedman's response) and decided that Mangino should receive a rental permit for 25 West 1st St. and should only be required to pay $125 and not the $875 previously demanded by the Town.  (Tr. 133.)  At some point after reviewing Raskin's April 28 letter, Wilson spoke to Raskin.  (Tr. 133.)  Wilson informed Raskin that he agreed with Raskin and he would inform the Rental Division not to pursue the back fees and to discontinue their policy of seeking back fees.  (Tr. 133–34.)  Wilson did not remember who he spoke with at Rental Permit Division about this issue, but he indicated that it could have been the clerical staff or the "the commissioner."  (Tr. 134 ("I don't remember who I spoke to, or whether it was a rental clerical staff, maybe it was the commissioner.").  Jones's testimony also suggested that someone from the Town Attorney's Office had contacted her and informed her about this policy change.  (Tr. 324 ("I should also say that the Town Attorney's office also was involved in code issues.  And so how did I learn about [the policy change concerning back fees]?  I was told about it.  I don't really remember.").  Jones testified that she was not told why past due permit fees would now be waived.  (Tr. 324.)

During Wilson's testimony, the jury heard somewhat differing accounts of why Wilson decided that back fees should no longer be sought.  (Tr. 54–56, 59–61, 133.)  At trial, Wilson

maintained that his main concern was the health and safety of the residents and that he wanted to ensure the properties were inspected.  (Tr. 54–56, 119, 133, 119.)  Wilson's trial testimony and deposition testimony also indicated that he had determined that the policy was "impermissible." (Tr. 54–56; Tr. 59–61 (deposition testimony).)

At trial, Wilson also disclosed that, despite his determination in 2009 that collection of back fees was impermissible, he later found out that there was, in a fact, a provision in the Town Code that allowed late fees to be imposed for belated permit renewal applications.  Specifically, Babylon Town Code § 153-5, which was enacted in May 2000, states:

> Based upon the recommendation of the Commissioner of Planning and Development, a late charge for permit fees required by § 153-5 of the Babylon Town Code equal to two times the amount of said fees, prorated for the period of time constituting the overdue period, shall be charged by the Commissioner for all permit renewals required by Town Code Chapter 153 which are overdue, in addition to any such permit fees.[13]

On September 28, 2009—after the rental permit for 25 West 1st St. had been issued on September 22—the Town brought a civil suit against Mangino.  (Pl. Tr. Ex. 8, ECF No. 114-12; Tr. 64, 67.) The suit alleged that Mangino violated the Town Code between August 26, 2009 and September 9, 2009 by renting out the property at 25 West 1st St. without a necessary rental permit.  The summons and complaint were signed by Afreen Wright,[14] an Assistant Town Attorney.[15]  (Pl. Tr. Ex. 8.)  The suit sought to enjoin Mangino from renting the property without a rental permit and sought $13,850 in civil penalties.  According to the complaint, Mangino owed $350 for the first

---

[13]  Relatedly, Jones testified that, in 2009, she believed that the Town had required payment of back fees for permits merely as a matter of policy.  (Tr. 321.)  However, a day or two before trial, she learned about the provision of the Town Code quoted above.

[14]  At the time of the events in question in 2009, Wright's last name was "Rizwan."  (See Pl. Tr. Ex. 8.)

[15]  The signature block on this complaint (and the other three similar complaints discusses below) lists, after Wright's signature name, the name and title of Paul Margiotta, the Town Attorney.  Margiotta's signature, however, is not on these filings.

day of his violation, $500 for the second day, and $1,000 for each additional day. The civil action covered the period during which Town was withholding the rental permit. (Tr. 65.) As explained below, the Town also brought similar civil suits against Mangino for his three other properties in the Town.

Although Wright was the attorney who signed each of these four complaints, a jury could conclude from Wilson's testimony that he was also involved in the initiation of these four civil suits. (Tr. 65.) Neither Wilson nor Wright testified that Jones had any involvement in the initiation of these civil suits.

**F.  Mangino's Three Other Properties in the Town**

As noted earlier, on August 25 or 26, 2009, the Town issued Mangino criminal summonses for his four rental properties in the Town because they all lacked rental permits. (Tr. 52, 65, 161–76.) At some point after he received those summonses, Mangino filed rental permit applications for these three other properties and eventually received those permits.[16] (Tr. 227.)

On September 28, 2009, Wright also brought civil suits on behalf of the Town against Mangino concerning his three other properties in the Town. (Pl. Tr. Ex. 16, ECF. 114-13; Tr. 196.) These complaints were largely identical to the civil suit that the Town filed concerning 25 West 1st St. All four civil complaints used largely identical language and each demanded $13,850 in penalties for each property because Mangino did not have a necessary rental permit for the properties between August 26, 2009 and September 9, 2009.

At trial, Wilson explained that these four civil suits were "another tool in the town code in order to gain compliance." (Tr. 119.) Wilson testified that compliance was important to the Town

---

[16]  At trial, Mangino did not offer any evidence establishing when these three rental permit applications were filed, when these properties were inspected, or when these permits were issued. (See Tr. 66–67, 227.)

because the Town Code is in place to ensure that landlords submit to an inspection and that the Town can verify that the property is livable and safe.  (Tr. 119.)

During the liability phase of the trial, there was no evidence about what occurred with the civil suits after they were filed.[17]

## G.  Subsequent Letters Between the Parties

On October 8, 2009, Mangino sent another letter addressed to Freedman, which again objected to the Town's method of service and threatened to sue if warrants were issued or he was arrested.  (Tr. 68; Pl. Tr. Ex. 9, ECF No. 110-12.)  A copy of the letter was also sent to Steve Bellone, the Town Supervisor.  (Id.)

On October 14, 2009, Wilson sent a response letter to Raskin.  (Tr. 69; Pl. Tr. Ex. 10, ECF No. 110-11.)  The letter stressed that the state court had rejected Mangino's argument that the method of service used for the summonses was improper.  (Pl. Tr. Ex 10.)  Wilson's letter also states:

> Please advise Mr. Mangino that any contact with the Supervisor or Assistant Town Attorney regarding the aforementioned case, while being represented by counsel, is impermissible and unethical.  Any and all communication with an official of the Town must be communicated with the consent of the Town Attorney's Office.  If Mr. Mangino is no longer your client please provide a notification that you are withdrawing as counsel.

(Id.)  Wilson testified that he included this language in his letter because it was his opinion that when there is pending litigation all communication should be between counsel.  (Tr. 70.)

---

[17]  At the damages trial, Mangino testified that, in response to these suits, he had retained Raskin and had to defend himself in these actions.  (Tr. 397–98, 410.)  Mangino spent approximately $7,000 defending these civil suits. Mangino also testified that the civil suits were still pending at the time of instant trial in 2019 and had never been dismissed even though nothing had happened in those civil cases for several years.  (Tr. 411–12, 417; see also Tr. 419–20.)  During its deliberations on damages, the jury asked questions about the status of the civil cases.  (Tr. 455–460; see also Tr. 419–20.)  In response to these questions, defense counsel asserted that the state court dockets indicated that these cases had all been marked "disposed."  (Tr. 455, 457, 458.)  However, because those dockets were not in evidence, the Court instructed the jury—in agreement with the parties—that:  "Nothing has happened in the civil case for the last 10 years. There is no evidence indicating that the town is actively pursuing the civil action against Mr. Mangino."  (Tr. 459–60.)

On October 15, 2009, Raskin sent a response letter to Wilson in which Raskin continued to object to the Town's method of serving the tickets.  (Pl Tr. Ex. 11, ECF No. 11; Tr. 71.)  Raskin's letter also responded to Wilson's assertion that Mangino should not contact certain Town officials:

> I am not thrilled that Mr. Mangino has chosen to communicate directly with your office, but he has that right.  As for Supervisor Bellone, he is not your client.  He is the elected Supervisor of the Town Of Babylon, and as such, Mr. Mangino has the constitutional right to communicate with him, as does any other citizen of this great and wonderful country.

(Id.)

On November 3, 2009, Mangino sent another warning letter to the Town similar to his prior letters.  (Pl. Tr. Ex. 12, Tr. 72, ECF No. 110-15.)  Mangino sent copies of this letter to Paul Margiotta (the Town Attorney), Bellone, Wilson, Freedman, and Wright.

On November 5, 2009, Wilson sent a response letter that was similar to Wilson's earlier letter from October 14, 2009.  (Pl. Ex. Tr. 13, ECF No. 118-1; Tr. 73.)  Raskin filed another response the next day that was addressed to Wilson and Margiotta.  (Pl. Tr. Ex. 14. ECF No. 118-2.)

On January 19, 2010, Mangino sent another warning letter to Bellone and Margiotta.  (Pl. Tr. Ex. 15, ECF No. 118-3; Tr. 76.)

## H.  Plaintiff's Monell Theory and the Court's Monell Instruction

At the end of the testimony in the liability trial, the Court gave the jury the following instruction about Monell liability, which was modeled on the Monell instruction that Mangino had submitted to the Court in proposed jury instructions he filed before trial:

In addition to claims against the individual defendants the plaintiff also alleges that the Town of Babylon retaliated against him in violation of the First Amendment. To hold a municipal entity such as the Town of Babylon liable plaintiff must prove by a preponderance of the evidence that a policy of the Town of Babylon caused a violation of plaintiff's First Amendment rights.  I instruct you that defendant Ann Marie Jones, commissioner of planning and development, was a policy making official whose actions may be attributed to the Town of Babylon in this case.

If plaintiff proves that her final actions affirmatively caused a deprivation of plaintiff's First Amendment rights, then the Town of Babylon is liable for any such retaliation.

(Tr. 372–73; see Pl.'s Proposed Jury Instructions, ECF No. 79-1 at 18.)

Neither party objected to this instruction.  As the charge above conveys, the jury was presented with a single Monell theory—that Jones was a final policymaker and that the Town was liable if Jones retaliated against Plaintiff.  The jury charge did not identify Wilson or Margiotta as final policymakers.  The Court also notes that the proposed jury instruction submitted by Plaintiff before trial also did not identify Wilson or Margiotta as relevant policymakers.

## II.  DISCUSSION

Defendants have moved for judgment as a matter of law under Rule 50 and for a new trial under Rule 59.  As explained below, Defendants' Rule 50 motion is denied, but their motion for a new trial under Rule 59 is granted.

### A.  **Rule 50 Motion**

The standards for granting a Rule 50 motion after trial are well-established:

[A] party is not entitled to challenge on appeal the sufficiency of the evidence to support the jury's verdict on a given issue unless it has timely moved in the district court for judgment as a matter of law on that issue.  Such a motion must be made "before submission of the case to the jury."  Fed. R. Civ. P. 50(a)(2).  Since the purpose of requiring that the motion be made before submission of the case to the jury is "to give the claimant a fair opportunity to cure the defects in proof," the motion "must at least identify the specific element that the defendant contends is insufficiently supported."  For the same reason, although a motion for [judgment as a matter of law ("JMOL")] may be "renew[ed]" after the jury returns its verdict, see Fed. R. Civ. P. 50(a)(2), it may be renewed only on grounds that were specifically articulated before submission of the case to the jury[.]

> As to any issue on which no proper Rule 50(b) motion was made, JMOL may
> not properly be granted by the district court, or upheld on appeal, or ordered by the
> appellate court unless that action is required in order to prevent manifest injustice.

Kirsch v. Fleet St., Ltd., 148 F.3d 149, 164 (2d Cir. 1998) (cleaned up).

In their Rule 50 motion, Defendants assert that they are entitled to judgment as a matter of because:  (1) there was no proof that Jones or any other Town official with the authority deny the permit was aware of Mangino's protected speech or that the denial was motivated by such speech; (2) there was no proof that Jones or any other policymaker was involved in the initiation of the civil suits.

Mangino asserts that Defendants did not raise these arguments in their Rule 50 motion at the end of Mangino's case or in any Rule 50 motion at the conclusion of the defense case.  The Court agrees.  Defendants did not sufficiently raise or pursue these arguments in Rule 50 motions at trial.  (See Tr. 300–309; Tr. 309 ("If [Jones's name is] on a document, then I withdraw the argument.").)  Notably, Defendants' post-trial motion briefs never even contend that these arguments were sufficiently raised at trial.

Defendants also never assert that the "manifest injustice" exception to Rule 50's preservation requirement is met here.  In any event, the Court concludes that there is no manifest injustice for purposes of Rule 50 "it may be that [Mangino] would have been able to present additional evidence," Kirsch, 148 F.3d at 165, to address these alleged deficiencies, particularly with respect to his claims about the initiation of the civil suits.

**B. Rule 59 Motion for a New Trial**

Defendants also move for a new trial under Rule 59.

**1.  Standard for Rule 59 Motions Seeking a New Trial**

There are multiple grounds for granting a new trial under Rule 59.

Even if a party fails to properly move for a directed verdict, a district court may still grant a new trial if the "undisputed evidence results in a verdict that is totally without legal support." Oliveras v. Am. Exp. Isbrandtsen Lines, Inc., 431 F.2d 814, 816–17 (2d Cir. 1970); see also Patsy's Italian Rest., Inc. v. Banas, 658 F.3d 254, 270 (2d Cir. 2011) ("'[W]here a jury's verdict is wholly without legal support, we will order a new trial in order to prevent a manifest injustice[,]' despite an appellant's failure to move for a directed verdict." (quoting Russo v. New York, 672 F.2d 1014, 1022 (2d Cir. 1982))).

A new trial may also be granted under Rule 59 if the verdict is against the weight of the evidence.  "A decision is against the weight of the evidence if and only if the verdict is (1) seriously erroneous or (2) a miscarriage of justice."  Raedle v. Credit Agricole Indosuez, 670 F.3d 411, 417-18 (2d Cir. 2012) (quoting Farrior v. Waterford Bd. of Educ., 277 F.3d 633, 635 (2d Cir. 2002)). In determining whether the jury's verdict is so "seriously erroneous" as to justify a new trial, the trial judge may weigh the evidence and "need not view it in the light most favorable to the verdict winner." Farrior, 277 F.3d at 634-35 (quoting DLC Mgmt. Corp., 163 F.3d at 134). But "the court should only grant such a motion when the jury's verdict is egregious." DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 134 (2d Cir. 1998) (quoting Dunlap–McCuller v. Riese Org., 980 F.2d 153, 158 (2d Cir. 1992).

A district court may also grant a new trial under Rule 59 where the jury instructions were erroneous.  See Cassotto v. Donahoe, 600 F. App'x 4, 5 (2d Cir. 2015).  But if "the challenging party failed to object to the charge at trial," the instructions are reviewed "for plain error, that is

'if the error affects substantial rights.'" Rasanen v. Doe, 723 F.3d 325, 332 (2d Cir. 2013) (quoting Fed. R. Civ. P. 51(d)(2)).  "[T]he plain error exception to Rule 51's objection requirement 'should only be invoked with extreme caution in the civil context.'"  Rasanen, 723 F.3d at 333 (2d Cir. 2013) (quoting Pescatore v. Pan Am. World Airways, Inc., 97 F.3d 1, 18 (2d Cir. 1996)).  "'To constitute plain error, a court's action must contravene an established rule of law," and "go[] to the very essence of the case."  Id. (cleaned up).

### 2. Denial of Permit Claims

#### i. Standard for First Amendment Retaliation

The jury found the denial of Mangino's permit application in April 2009 was motivated by his protected speech and that both Jones and the Town were liable for this retaliation.  Defendants contend that the evidence at trial was not sufficient to support those verdicts because, inter alia, there was no evidence that Mangino's speech was a motivating factor in the permit denial.

To establish a prima facie case of First Amendment retaliation, a plaintiff must show (1) he engaged in protected speech; (2) that the defendant subjected him to an adverse action; and (3) "that there was a causal connection between the protected speech and the adverse action." Heim v. Daniel, 81 F.4th 212, 221 (2d Cir. 2023) (quoting Shara v. Maine-Endwell Cent. Sch. Dist., 46 F.4th 77, 82 (2d Cir. 2022); see also Tr. 368–70 (jury charge).

"To show causation, 'a plaintiff must show that the protected speech was a substantial motivating factor' in the adverse action."  Heim, 81 F.4th at 221 (quoting Smith v. County of Suffolk, 776 F.3d 114, 118 (2d Cir. 2015)).  In some cases, a close temporal proximity between the plaintiff's protected speech and the adverse actions taken against the plaintiff can be "enough to overcome summary judgment," provided that the temporal proximity is sufficient to "give rise

to an inference of causation." Musco Propane, LLP v. Town of Wolcott Plan. & Zoning Comm'n, 536 F. App'x 35, 39 (2d Cir. 2013).

After a plaintiff establishes his protected speech was a motivating factor in an adverse action, a defendant can prevail by establishing by a preponderance of the evidence that it would have taken the same adverse action "even in the absence of the protected conduct." Heim, 81 F.4th at 222 (quoting Nagle v. Marron, 663 F.3d 100, 111-12 (2d Cir. 2011)).

*ii. Overview*

As explained below, a new trial is warranted on Mangino's claims that Jones and the Town retaliated against him by denying his rental permit application in April 2009.  The jury's verdicts against Jones and the Town on this claim are both "totally without legal support" and against the weight of the evidence.  The evidence at trial was not sufficient for a reasonable jury to find against Jones and the Town on this claim.  Additionally, even assuming arguendo that the evidence was sufficient, the Court finds that the verdicts on this claim were "seriously erroneous."

Mangino contends that Jones retaliated against him by denying his permit application and that the Town is liable under Monell for such retaliation because Jones was the final policymaker for permit denials.  But a reasonable jury could not find, based on the record at trial, that any of Mangino's protected speech motivated the denial of his rental permit application in April 2009.  Moreover, even if there was sufficient evidence to support the jury verdict on these claims, the Court finds that the jury's verdict was seriously erroneous.  The Court finds that the credible evidence overwhelmingly established that the Mangino's protected speech was not a motivating factor in the denial of the permit.[18]

---

[18] Even assuming arguendo that Mangino's protected speech was a motivating factor in the denial of the permit, the Court also finds that Defendants proved by overwhelming credible evidence that the permit would have been denied in any event.

The record contains no direct evidence that Jones harbored retaliatory animus or made any statements about Mangino's protected speech.  Accordingly, Mangino must rely on an alleged temporal proximity between his protected speech and the permit denial to establish causation.  The evidence at trial, however, was simply insufficient to establish causation based on temporal proximity.  As explained below, there was insufficient evidence at trial to establish that Jones was personally involved in the permit denial or aware of any of Mangino's protected speech in March and April 2009.  More importantly, even assuming that Jones was involved in the permit denial and aware of Mangino's protected speech, the evidence at trial was still patently insufficient to establish causation based on temporal proximity because, before Mangino engaged in any protected speech, the February 19, 2009 Final Notice had demanded that Mangino pay $875 in fees to receive a rental permit.  Each of these points are addressed in depth below.

### iii.  Temporal Proximity Does Suggest Causation Here

The February 19, 2009 Final Notice—which was issued before any protected speech by Mangino—demanded that Mangino pay $875 and file for renewal permits going back to the 1999-2000 period.  Given this indisputable fact, a reasonable jury could not conclude that Mangino's subsequent protected speech was a motivating factor in the denial of his rental permit application.  When Mangino submitted this rental application in March 2009, he only tendered $125 and not the $875 that the Town had previously told Mangino, in February 2009, that he had to pay.  The Town demanded that Mangino pay $875 both before and after Mangino's protected speech.  Given this critical fact, a reasonable juror could not find that Mangino's protected speech was a motivating factor in Jones's alleged denial of the rental permit.

At trial, there was testimony from Jones and Wilson that the Town's collection of back fees for belated renewal permit applications was a long-standing policy.  Defendants contend that,

given this long-standing policy, a jury could not find that the Town's demand for $875 and denial of the permit application on that basis was motivated by any protected speech.  Plaintiff argues that the jury was not required to accept this testimony because, at his deposition, Wilson testified that, before the events of 2009 involving Mangino, he was not aware that the Town had this policy of pursuing back fees.  (Tr. 60.)  The Court, however, finds that the overwhelming credible evidence in the record established that there was such a policy.[19]

In any event, the parties' dispute about whether this was a long-standing policy is ultimately irrelevant.  Even if the Town did not have a long-standing policy of demanding back fees, the critical fact here is that the Town had demanded that Mangino pay $875 in back fees in February 2009 before he engaged in any protected activity.  Given this fact, even if Mangino could establish that the denial of the permit occurred after he engaged in protected speech, the temporal proximity between Mangino's speech and the permit denial would be insufficient for a jury to infer his protected speech was a motivating factor in the denial of the permit application.  See Musco Propane, 536 F. App'x at 39–40 ("[W]e would be hard-pressed to find a rational juror who could infer that a course of action begun before Musco's protected speech could be caused by retaliation for that First Amendment activity.").

Mangino notes that, after receiving the February 19, 2009 Final Notice, he applied for a "new" permit, rather than a renewal permit.  But the Town's determination in April 2009 to reject Mangino's "new" permit application and tender of only $125 does not, in any way, suggest

---

[19]  Wilson's deposition testimony—in which he stated that Mangino's case was the first time Wilson had heard about this policy, (Tr. 61)—does not indicate (or convince the Court) otherwise.  There was no evidence at trial establishing that—during his previous three years in the Town Attorney's office—Wilson had ever encountered any cases where this policy would have been implicated.  There was also no evidence that the Rental Permit Division had treated any similar belated permit applications submitted by other owners differently than Mangino's.

retaliatory intent because the Town had told Mangino, in the February 19, 2009 Final Notice, that he had to file for renewal permits and pay $875.

Additionally, both the timing and substance of Mangino's alleged protected speech does not suggest that this speech was a motivating factor in the denial of the permit.  The record at trial does not indicate that any of the letters Mangino identifies as his protected speech were sent to the Town before the denial of the permit request.  Freedman communicated the denial of the rental permit to Mangino in a letter dated April 24, 2009 (and Mangino testified at trial that he was informed of the denial before the April 24 letter).  The trial record, however, does not indicate that any of the letters drafted by Mangino and Raskin were sent to anyone at the Town before April 24, 2009.[20]

Mangino has claimed that his tender of a $125 check for the rental permit application in March 2009—after the Town had demanded $875—constituted protected speech and was effectively a protest against the Town's demand for higher fees.  Even if this $125 check constitutes protected speech, a reasonable jury could not find that this check was a motivating factor in the Town's decision to require Mangino to pay $875 for the permit given that the Town had previously demanded that Mangino pay $875 in February 2009.  The Town's position did not change after Mangino tendered the $125 check.

Given the evidence above, Mangino cannot establish that Jones or any employee or official of the Town who was allegedly involved in the denial of his permit in April 2009 was motivated

---

[20] To the extent Mangino claims that the motion to dismiss he filed in the criminal action constituted relevant protected speech, the record does not indicate that this motion motivated the permit denial.  First, the trial record did not even identify when exactly this motion was filed.  Mangino's own attorney testified that this motion was filed in June 2009.  Second, even if the motion was filed before the permit denial, the notion that anyone at the Town—let alone Jones— was motivated to deny Mangino's permit application because Mangino because filed a run-of-the-mill motion to dismiss in the criminal action that challenged the Town's method of serving the criminal summons is absurd, particularly in light of the Town's February 2009 demand for $875 in fees.

by his protected speech.  Accordingly, the Court finds that the verdicts against Jones and the Town

on this claim are both "totally without legal support" and against the weight of the evidence.

### iv.  Mangino also Failed to Establish that Jones Knew About His Protected Speech or was Involved in the Permit Denial

The evidence in the record was also insufficient for a reasonable jury to conclude that Jones

was:  (1) aware of any of Mangino's protected speech in March or April 2009; or (2) personally

involved in the denial of Mangino's application.  Additionally, a contrary finding would, in any

event, be against the weight of the evidence.

If Jones was unaware of Mangino's speech, the retaliation claim against her would

necessarily fail.  Jones denied knowledge of this speech.[21]  None of the letters or motions submitted

by Mangino and Raskin were addressed to Jones.  There are no emails or documents indicating

that any of these letters or motions were forwarded to Jones.  And no witnesses testified that they

spoke with Jones about these letters or motions in March and April 2009.

There is also no evidence that: (1) Jones was ever informed in March or April 2009 that

Mangino had submitted a $125 check for his permit application; or (2) that Jones was personally

involved in the denial of that application in April 2009.  Jones testified that the clerical employee

in the Rental Division never mentioned Mangino's rental permit application and the issues

surrounding it to her.  (Tr. 327.)

Mangino maintains that the following circumstantial evidence was nevertheless sufficient

for a jury to infer both that Jones was aware of his protected speech in April 2009 and that she was

personally involved in the denial of the permit:

- Jones's signature appears on the February 2009 Final Notice, which Mangino characterizes as "the most direct physical evidence of Jones['s] involvement in the denial of plaintiff's rental permit," (Pl. Opp'n Br. at 7).

---

[21] Jones testified that, prior to Mangino bringing the instant lawsuit in 2014, Jones never saw any of the letters Mangino and Raskin sent, and was not even aware of those letters.  (Tr. 322–23.)

- Freedman's April 30, 2009 letter threatened that Mangino would be issued summonses if he failed to obtain a rental permit and the inspectors who issue such summonses worked at the Code Enforcement Division, which was part of the Planning Department that Jones headed.

- On April 23, 2009, an inspector from the Code Enforcement Division issued Mangino another summons for not having a rental permit.

- Wilson and Jones testified that Wilson communicated to Jones that the policy of seeking back fees for rental permits should be discontinued.[22]

- The September 22, 2009 letter that granted Plaintiff's permit also contains Jones's signature.

The Court finds that this evidence is insufficient for a reasonable jury to infer that Jones was both aware of Mangino's protected speech in April 2009 and personally involved in the April 2009 permit denial. Thirty employees worked under Jones, and Code Enforcement was only one of the many divisions in the Planning Department. Neither the clerk in the Rental Permit Department nor any of the inspectors who issued Mangino summonses testified at trial. Additionally, the April 24 letter informing Mangino of the permit denial was drafted by Howard Freedman, an Assistant Town Attorney who also did not testify at trial.

Moreover, the credible evidence at trial established that Jones's signature on the February 19, 2009 Final Notice was electronically affixed, without Jones's involvement, by the clerk in the Rental Permit Department. There was no evidence at trial contradicting this testimony from Jones, who headed a department with thirty employees and who was surely not personally involved in every letter that bore her electronic signature. In any event, even assuming that Jones was personally involved the issuance of the February 19, 2009 Final Notice, such involvement is

---

[22] Mangino asserts that given this testimony from Wilson and Jones concerning their communications about the policy change, it can be inferred that Mangino's name did, in fact, come up during these communications and that, as such, the jury was entitled to reject Jones's testimony, including her claim that she had never heard his name before she was sued in the instant lawsuit.  (See Tr. 322.)

insufficient for a reasonable jury to infer:  (1) that Jones was involved in the subsequent denial of the permit two months later, particularly when the April 24 letter communicating that denial was from Freedman and did not bear Jones's signature; or (2) that Jones aware of any of Mangino's protected speech in March or April 2009.

While Mangino stresses the conversation between Jones and Wilson about the policy change in September 2009, it is not reasonable to infer from this single conversation that Jones also communicated with Freedman or Wilson about this policy or Mangino months earlier, in March and April 2009.  Similarly, Jones's electronic signature on the September 22 letter also does not indicate that Jones was personally involved in April 2009 or aware of any of Mangino's speech at that time.

Finally, as stressed earlier, the most critical fact is that in the February 19, 2009 Final Notice, the Town had demanded that Mangino pay $875 before any of his protected speech.  As such—even assuming arguendo that Jones played a role in the denial of Mangino's permit request in April 2009 and was aware of his protected speech at that time—Mangino still cannot establish causation based on temporal proximity given the February 19, 2009 Final Notice.

### v.  Mangino's Monell Claim About the Permit Denial Also Fails

The Court's determination that the evidence is insufficient hold Jones liable in her capacity as an individual defendant is also dispositive of Plaintiff's Monell claim related to the denial of the permit in April 2009.

Under Monell v. Department of Social Services, 436 U.S. 658 (1978), a municipality may be held liable for a constitutional violation that is undertaken pursuant to "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers[,] ... [or] pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels."  Id. at 690–91.  At trial, Mangino

pursued <u>Monell</u> liability for all his claims solely on the theory that Jones was a final policymaker whose individual actions represented official Town policy and thus rendered the Town liable under <u>Monell</u>.  <u>See</u> <u>Agosto v. New York City Dep't of Educ.</u>, 982 F.3d 86, 98 (2d Cir. 2020) (explaining final policymaker theory under <u>Monell</u>).

Because the permit denial claim against Jones in her individual capacity fails, Plaintiff's <u>Monell</u> claim premised solely on Jones' status as a final policymaker also necessarily fails.  <u>See, e.g.</u>, <u>Goe v. Zucker</u>, 43 F.4th 19, 34 (2d Cir. 2022) (affirming dismissal of <u>Monell</u> claim for lack of an underlying constitutional violation by the individual defendants).  Notably, Plaintiff does assert any alternative basis to uphold the jury's verdict against the Town on the permit denial claim if the evidence is found insufficient to hold Jones individually liable.[23]

For the reasons set forth above, the Court vacates the jury verdicts on the permit denial claims against Jones and the Town and grants Defendants a new trial on those claims.[24]  These verdicts are both "totally without legal support" and against the weight of the evidence.

---

[23]  As discussed <u>infra</u>, Mangino contends that the <u>Monell</u> claim concerning the initiation of the civil suits should be upheld on alternative grounds, including on the basis that Wilson also allegedly qualifies as a final policymaker. Mangino, however, does not advance any such alternative arguments for the permit denial claim.

[24]  The Court's conclusion above that the evidence at trial was insufficient for a jury to find that either Jones or the Town retaliated against Mangino by denying the rental permit in April 2009 may lead the reader to wonder why the Court did not grant Defendants judgment as a matter of law under Rule 50 on this claim based on the manifest justice exception.  Admittedly, it is difficult to see how, given the facts above, Mangino could possibly establish at a second trial that the denial of the rental permit in April 2009 was retaliatory.  However, because Defendants did not move for judgment as a matter of law on this ground, Mangino should at least be given that opportunity.

Additionally, the Court's determination below that a new trial is also necessary on Mangino's retaliation claims concerning the initiation of the civil suits is a further reason not to grant judgment as a matter of law on the denial of permit claim.  The facts concerning both claims are intertwined and these same facts would be presented at the second trial even if that trial was limited to the claim concerning the initiation of the civil suits.  If, at the second trial, there is ultimately insufficient evidence to support any retaliation claims based on the permit denial, the Court can grant Defendants judgment as a matter of law at the time.

### 3.  Claims Concerning the Allegedly Retaliatory Civil Suits

The other claims for which Jones and the Town were found liable concerned the allegedly retaliatory commencement of civil proceedings in October 2009.  The Court finds that the evidence at trial was insufficient for a reasonable jury to find that Jones was liable as an individual defendant or that the Town was liable on the <u>Monell</u> claim advanced at trial.  Additionally, even if the evidence could overcome a sufficiency challenge, the Court finds that the jury's verdict is against the weight of the evidence.  The jury's verdicts on these claims are both "totally without legal support" and against the weight of the evidence.

Mangino also asks the Court to uphold the <u>Monell</u> verdict on <u>Monell</u> theories that were not presented at trial.  The Court, however, finds that a new trial is warranted given all the circumstances here, which include Mangino's reliance on a single deficient <u>Monell</u> theory at trial, the jury's additional unsupported (and potentially prejudicial) verdict on the related permit denial claim, and the absence of any instructions concerning the alternative <u>Monell</u> theories Mangino now asserts.

#### i.  Claim Against Jones in Her Individual Capacity

There is simply no evidence that Jones played any role in the initiation of the civil proceedings.  Mangino's brief asserts, in conclusory fashion, that Jones was involved in the "retaliatory conduct," but never even expressly argues that Jones was actually involved in the initiation of the civil suits.  (Pl. Opp'n Br. at 6–10.)

To the extent that Mangino asserts there is sufficient circumstantial evidence to suggest that Jones was involved in the filing of these civil suits, the Court is not persuaded.  The relevant circumstantial evidence cited in Mangino's brief was previously recounted in addressing the permit denial claim.  A reasonable jury could not find from this evidence—including the testimony

about the September communication between Wilson and Jones concerning the policy change and Jones's signature on the September 22 letter granting the permit—that Jones had any involvement in, or even knowledge of, the later initiation of the civil suits.  Jones did not admit to any involvement in, or knowledge of, those suits.  There are no documents or emails involving Jones and those suits.  Wilson and Wright—the two Town attorneys who were involved in the civil suits—testified at trial and neither said anything to suggest that Jones was involved in the initiation of the civil suits or even knew of their existence.  A jury would have to engage in speculation to find Jones liable on this basis.  Moreover, even assuming _arguendo_ that there was sufficient circumstantial evidence to support a jury verdict, the Court finds that, given the extremely thin circumstantial evidence cited by Mangino, the jury's verdict on this claim was against the weight of the evidence and seriously erroneous.  The Court finds that the credible evidence overwhelmingly established that Jones had no role in the initiation of the civil suits.

Because there was insufficient evidence at trial to support the verdict against Jones, the Cour grants her a new trial on this claim.

### ii.  _Monell_ Claim Against the Town

As with the denial of permit claim, Plaintiff's sole _Monell_ claim at trial concerning the civil suits was based on Jones's status as a final policymaker.

As explained above, there was insufficient evidence at trial to establish that Jones was personally involved in the initiation of the civil suits.  Plaintiff nevertheless contends that he still has a viable _Monell_ claim based on the following theory:  (1) Jones, acting as a final policymaker, retaliated against Plaintiff by denying and withholding the rental permit; (2) that denial ultimately caused the initiation of the civil suits; and (3) the civil suits were a foreseeable consequence of the rental permit denial.  This theory, however, is based on a faulty premise.  As explained in the prior

section, even assuming that Jones was involved in the denial of the permit, there is insufficient evidence to establish that the denial of the permit was motivated by Mangino's protected speech. The February 19, 2009 Final Notice demanded, before any of his protected speech, that Mangino pay $875 to obtain the rental permit.  That position did not change until September 2009.  Because Plaintiff has not established that Jones's alleged denial of the permit application was motivated by his protected speech, even if the denial of the permit could be considered a cause of the initiation of the civil suit for 25 W. 1st St., that fact would not provide a basis to uphold the jury's verdict that the Town is liable under Monell for the allegedly retaliatory civil suits.[25]  There was not sufficient evidence introduced at trial to support the jury's verdict on the Monell claim Plaintiff advanced at trial.[26]

Mangino contends that the jury's Monell verdict concerning the civil suits should be upheld under two alternative Monell theories.  First, Mangino asserts that Wilson, who admitted being involved in the civil suits, qualifies as a final policymaker for Monell.  Mangino points to Wilson's testimony that he "would make decisions on cases."  (Tr. 81.)  Mangino also relies on the Town Code, which states that "[t]he Town attorney appoints deputy and assistants . . . who shall generally act for and in his behalf."  (Babylon Town Code § 6-3 (emphasis added).)  The Town Code, however, also makes clear that the "[t]he principal executive officer and administrative head of [Town Attorney's Office] shall be the Town Attorney, who shall be appointed by the Town Board"

---

[25]  While Mangino's brief appears to assert that the Town improperly withheld the permit applications for his other three properties, (Pl. Opp'n Mem. at 14–15), Mangino does not cite any evidence in support of this argument and the trial record did not indicate that these permits were improperly withheld or delayed.  At trial, Mangino did not offer any evidence establishing when these three rental permit applications were filed, when these properties were inspected, or when these permits were issued.  (See Tr. 66–67; 227.)  And there was certainly no evidence to indicate that the Town's handling of these permit applications was retaliatory.  (See Tr. 227 (Mangino's testimony indicating he "probably" received those permits "shortly after [he] applied" for them).)

[26]  For similar reasons, this theory also cannot support the jury's verdict holding Jones individually liable for the allegedly retaliatory civil suits.

and that the "Town Attorney shall be the head of the department." (Babylon Town Code § 6-2.)[27] At trial, Wilson also explained that the Town Attorney oversaw the deputy attorneys in the office. (Tr. 81-82.)

Second, Mangino contends that even if Wilson is not a final policymaker, the Town Attorney is a final policymaker and the Town Attorney subsequently ratified the filing of the civil suits.

Given all the circumstances here, the Court finds that it would be inappropriate to rely on Mangino's alternative Monell theories to deny the Rule 59 motion and uphold the jury verdict. The jury was instructed on a single Monell theory—that Jones was a final policymaker and that the Town is liable if "her final actions affirmatively caused a deprivation of plaintiff's First Amendment rights." (Tr. 372–73.) Not only was there insufficient evidence to support the jury's Monell verdict concerning the civil suits, but the jury also found Jones and the Town liable on the permit denial claims, another theory that was also not supported by sufficient evidence. There is a substantial likelihood that the jury's unsupported verdict on the permit denial claims infected its verdict concerning the allegedly retaliatory civil suits, particularly given the specific language in the Monell instruction quoted above.[28]

Additionally, the jury was not instructed that Wilson or Margiotta were final policymakers and the charge never explained (or even mentioned) the concept of ratification. While courts are hesitant to grant new trials based on unpreserved challenges to jury instructions, this is not a typical claim of instructional error. Defendants do not contend that the Court's Monell instruction

---

[27] While other portions of the Town Code were introduced at trial, none of the provisions of the Town Code concerning the Town Attorney and Deputy Town Attorney were before the jury.

[28] There was also a substantial likelihood that the jury's unsupported verdict on the permit denial claims infected its verdict that Jones was individually liable on the civil suits claim, which is a further reason to grant Jones a new trial on the civil suits claim.

misstated the law.  Rather, the issue here is that Plaintiff did not pursue these alternative <u>Monell</u>

theories at trial and never asked the Court to instruct the jury on these alternative theories.  The

Court would not expect the Defendants to request that the jury be instructed on additional theories

of liability that the Plaintiff is not pursuing.  Perhaps if Defendants had clearly articulated their

current challenges in a Rule 50 motion at trial, that might have spurred Plaintiff to pursue

additional <u>Monell</u> theories.  Even so, that does not completely absolve Plaintiff here.

Even assuming <u>arguendo</u> that Wilson and the Town Attorney qualify as final policymakers,

the absence of any instructions identifying them as such is particularly problematic.  The question

of whether an official is a final policymaker for <u>Monell</u> purposes is a matter of law for the court to

decide based on state law.  <u>See</u> <u>Jeffes v. Barnes</u>, 208 F.3d 49, 57–58 (2d Cir. 2000).

In <u>Soltesz v. Rushmore Plaza Civic Ctr.</u>, 847 F.3d 941, 946–48 (8th Cir. 2017), the Eighth

Circuit stressed that it is critical that district courts identify the relevant final policymaker for the

jury.  <u>Soltez</u> explained that:

> [N]o legally sufficient evidentiary basis exists to impose liability on a municipality
> for the decisions of a final policymaker when the district court fails to identify that
> policymaker.  The district court must identify the final policymaker as a matter of
> law before the claims reach the jury.  Even if the plaintiff proceeds on a theory of
> delegation or ratification, the court must identify the final policymaker.  Failing to
> do so raises the risk of respondeat superior liability—a risk we cannot tolerate.  For
> § 1983 liability to attach, the jury must find the decision of a final policymaker
> caused the constitutional deprivation.  If the jury is not instructed as to who the final
> policymaker is, it cannot find that the decision of a final policymaker caused any
> constitutional deprivation.  <u>A verdict imposing municipal liability on the decision</u>
> <u>of a final policymaker, when the jury receives no instruction on the final</u>
> <u>policymaker's identity, cannot be affirmed</u>.

<u>Soltesz</u>, 847 F.3d at 941 (emphasis added and cleaned up).  Notably, <u>Soltesz</u> also rejected the

district court's post-trial determination that one official involved was, in fact, a final policymaker,

concluding that such a post-trial finding could not "remedy the error."  <u>Id.</u>  Admittedly, <u>Soltesz</u>

was on a different procedural footing as the defendant in <u>Soltesz</u> objected to the district court's

failure to identify the relevant policymaker and thus preserved this issue for appeal.  Even still, Soltesz's logic—which stresses the critical importance of identifying the relevant final policymaker for the jury—is still persuasive.

Given all the circumstances here—including the Plaintiff's reliance on a single deficient Monell theory at trial, the jury's additional unsupported (and potentially prejudicial) verdict on the related permit denial claim, and the absence of any instruction identifying Wilson or Margiotta as final policymakers—the Court finds a new trial is warranted on this Monell claim.  The confluence of all these circumstances affected the Town's "substantial rights" and warrants a new trial. Rasanen, 723 F.3d at 332; cf. Cassotto, 600 F. App'x at *6.

### III.  CONCLUSION

For the reasons stated above, Defendants' Rule 50 motion is denied and their Rule 59 motion for a new trial is granted.

**SO ORDERED.**

Dated:  February 26, 2024
Central Islip, New York

                                                           _____/s/ (JMA)_____

                                                   JOAN M. AZRACK
                                                   UNITED STATES DISTRICT JUDGE